UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2010 SEP 16  PM 2: 09

CLERK

BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:10-cr-15-01 |
| | ) | |
| FLOYD ARTIS | ) | |

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS
(Doc. 19)

This matter came before the court on September 1, 2010 for an evidentiary hearing on Defendant Floyd Artis's motion to suppress. Mr. Artis seeks suppression of all statements he made to law enforcement during a January 8, 2010 interview on the grounds that he did not validly waive his *Miranda* rights and because his confession was involuntary. The Government opposes the motion. The Government is represented by AUSA Nancy Creswell. Mr. Artis is represented by Alison Arms, Esq.

Mr. Artis is charged in two counts of a superseding indictment.[1] Count one alleges that on or about November, 2008, and continuing until on or about June, 2009, in the District of Vermont, Mr. Artis and James Welcome conspired with each other to distribute heroin, a Schedule I controlled substance, and twenty-eight grams or more of a mixture or substance containing cocaine base, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846. Count two alleges that Mr. Artis violated 18 U.S.C. § 924(a)(1)(A) and 18 U.S.C. § 2 when, on or about May 7, 2009 in the District of Vermont, and in connection with the acquisition of a firearm from licensed firearm dealer Craigin's Gun Shop, he aided, abetted, counseled, commanded, induced and procured Mandy Blanchard to knowingly make a false statement that she was the actual buyer of the firearm when, instead, she was purchasing it for Mr. Artis.

---

[1] The government obtained a superseding indictment against Artis on September 9, 2010. (Doc. 23.)

## Findings of Fact

On January 8, 2010, Detective Michael Henrique, a member of the New York City Police Department's firearms task force and a member of the Bureau of Alcohol, Tobacco and Firearms ("ATF") task force, interviewed Floyd Artis at the Rikers Island correctional facility in New York. Special Agent James Mostyn, ATF's Supervisory Special Agent in Vermont, and ATF Agent Thomas McCoy, were part of the interview team. Detective Henrique made the arrangements for the interview of Mr. Artis. He does not know what, if anything, corrections officials told Mr. Artis regarding the reason for the interview. At the time of the interview, Mr. Artis was serving a sentence for an unrelated narcotics conviction in New York.

Rikers Island is a multi-purpose complex that houses a number of inmates in various detention centers segregated according to inmate population. The complex includes an "intelligence center" in which various law enforcement agencies have offices. The intelligence center is used to conduct interviews away from an inmate's residence to preserve the safety and security of those being interviewed. It contains holding cells where an inmate may be placed prior to his or her interview.

On the day in question, corrections officers brought Mr. Artis to the intelligence center in handcuffs. It is unknown whether he was placed in a holding cell prior to his interview. The room in which he was interviewed is a windowless, approximately 10' x 10' room with a desk and chairs that is, according to Detective Henrique, "almost like an office." Mr. Artis was told to "sit wherever you like." He chose a chair along the wall opposite the door. Detective Henrique sat to his left with Agent McCoy seated by Detective Henrique's left shoulder closer to the door. Special Agent Mostyn sat in a chair behind the desk facing Mr. Artis. Detective Henrique testified that he is not sure whether the door to the room was locked. Mr. Artis was not in handcuffs during the interview. There is no evidence that Mr. Artis was advised that he was free to leave the interview.

The law enforcement officers interviewing Mr. Artis wore casual street clothes. None of them carried a firearm. They did not move from their chairs during the course of the interview, and never physically touched Mr. Artis. They made no threats or promises to him. There is no evidence that, in the course of the interview, the officers engaged in trickery or deceit. The entire interview lasted between fifteen and twenty minutes. There is no evidence that Mr. Artis signed a written statement at the interview's conclusion.

Prior to the interview, Detective Henrique read the police reports regarding a domestic incident involving Mr. Artis which led to his arrest in June of 2009. At the time of his arrest, Mr. Artis was allegedly in possession of a loaded handgun which was traced back to a firearm purchased by Mandy Blanchard in Rutland, Vermont. Detective Henrique was also aware of Mr. Artis's criminal history which included several drug related arrests, a felony conviction for possession of cocaine in Vermont for which Mr. Artis served a sentence, a narcotics conviction in New York, and an arrest arising out of a domestic incident. Detective Henrique was also aware that Mr. Artis was alleged to have dealt cocaine and heroin in both Vermont and Brooklyn. According to Detective Henrique, the interview had a "narcotics angle" but its primary purpose was to obtain information regarding the source of the firearm seized upon Mr. Artis's arrest.

Detective Henrique and the other law enforcement officers introduced themselves to Mr. Artis. They advised Mr. Artis that they wanted to talk to him about the firearm recovered upon his arrest in June of 2009. Detective Henrique then read Mr. Artis his *Miranda* rights from a pre-printed form. Mr. Artis initialed the form after each right was read. The pre-printed form is entitled "Advice of Rights and Waiver." Thereafter the one-page document sets forth the following "Statement of Rights":

- You have the right to remain silent.

- Anything you say can be used against you in court.

3

- You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins.
- If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

Government's Exhibit #1. Mr. Artis's initials ("F.A.") appear after each of the foregoing statements. The "Statement of Rights" portion of the form is followed by a portion entitled "Waiver" that states as follows:

> I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

Mr. Artis's signature and printed name follow this waiver. The form was signed by Detective Henrique at 1145 hours.

Thereafter, Detective Henrique asked Mr. Artis some "pedigree" questions which Mr. Artis readily answered, including providing the name of his sister. Detective Henrique "talked a lot" and questioned Mr. Artis extensively during the relatively brief interview, although it appears that all three law enforcement officers asked questions. Detective Henrique was "rather friendly" with Mr. Artis, discussed his familiarity with Mr. Artis's neighborhood in Brooklyn, and told him that he would "make him no promises and tell him no lies." He offered Mr. Artis cigarettes which they both smoked during the course of the interview. In a "jovial tone," Mr. Artis volunteered that "he was kind of figuring that someone from Vermont would be coming regarding the firearm."

The law enforcement officers asked Mr. Artis questions about his alleged drug trafficking activities in Vermont and New York. Mr. Artis acknowledged that he had been dealing cocaine and heroin in both Vermont and New York City and provided the names of some individuals he had met in the course of those activities.

4

With regard to the facts charged in count two of the Indictment, Mr. Artis advised law enforcement that Mandy Blanchard had purchased the firearm in Vermont for protection after she had been "jumped." According to Mr. Artis, Ms. Blanchard, who was then Mr. Artis's girlfriend, brought the firearm from Vermont to New York City in a rental car and then left both the rental car and the firearm behind. Mr. Artis stated that it was Ms. Blanchard's practice to provide rental cars for his use so that he could avoid taking taxis in the city. Mr. Artis reported that he had discovered the firearm in the rental car after Ms. Blanchard left, and thereafter brought it up to his residence.

In the course of the interview, both Detective Henrique and Special Agent Mostyn repeatedly cautioned Mr. Artis to be truthful, accused him of being untruthful, and advised him that it was a crime to lie to federal agents. Mr. Artis responded that the officers should contact Mandy Blanchard who would confirm that everything he said was true. Detective Henrique then asked Mr. Artis when he had last seen Ms. Blanchard. Mr. Artis advised that he had last seen her upon his arrest in June of 2009. When Detective Henrique confronted Mr. Artis with the fact that Ms. Blanchard had logged in as a visitor several times at Rikers Island, Mr. Artis admitted that he had lied about that but was telling the truth about everything else. On more than one occasion, he assured the law enforcement officers that he could "do his time with regard to the firearm charge with no problem."

Mr. Artis's demeanor throughout the interview was "almost amused." He never asked to terminate or leave the interview. He never asked for an attorney.

The officers used profanity in the course of the interview. It was not, however, directed at Mr. Artis. At the conclusion of the interview, Special Agent Mostyn got upset and placed his hands on the table and leaned closer to Mr. Artis. As he did so, his tone of voice became elevated and he was "making his point," although he was neither screaming nor yelling. He expressed his belief that Mr. Artis was lying. Mr. Artis was not

5

questioned after this occurred and the interview was terminated. Detective Henrique shook hands with Mr. Artis at the interview's conclusion and wished him luck.

## Conclusions of Law

Pursuant to Fed. R. Crim. P. 12(b)(3)(c) and 41, Floyd Artis seeks suppression of all statements he made during the January 8, 2010 interview on the grounds that he did not validly waive his *Miranda* rights and his statements were not voluntarily made. The Government opposes suppression, contending that Mr. Artis was not in custody when questioned and that, in any event, he validly waived his *Miranda* rights and the statements he gave to law enforcement were entirely voluntary.

### A. Validity of *Miranda* Waiver.

In order for Mr. Artis to challenge the validity of his *Miranda* waiver, the court must first determine whether he was subjected to custodial interrogation, the absence of which obviates the need for *Miranda* warnings. *See United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004). Although it is well-established that the Government bears the burden of proving that a suspect received notice of his *Miranda* rights and waived them voluntarily, *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986), neither the Supreme Court nor the Second Circuit has squarely decided which side bears the burden of establishing that custodial interrogation did or did not take place. Other courts have reached divergent conclusions. *Compare United States v. Webb*, 755 F.2d 382, 390 (5th Cir. 1985) ("the defendant bears the burden of demonstrating that statements which the defendant seeks to suppress were made while the defendant was under custodial interrogation"), *with United States v. Miller*, 382 F. Supp. 2d 350, 361-62 (N.D.N.Y. 2005) (finding that the government bears the burden "to prove *Miranda* voluntariness, either *because there was no custodial interrogation* implicating *Miranda*, there was some exception to the *Miranda* rule, or because [the defendant] was properly *Mirandized* and waived his rights") (emphasis supplied). The weight of authority appears to hold that a

6

defendant bears the burden of establishing that he or she was subjected to custodial interrogation in order to establish a constitutional violation as the basis for suppression of evidence.[2] Here, regardless of who has the burden of proof, the court finds that custodial interrogation occurred.

    1.    *Custodial Interrogation.*

"Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Interrogation" consists of "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect[.]" *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). In addition, there must be "a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300.

It is undisputed that law enforcement questioned Mr. Artis in a manner intended to elicit an incriminating response. To determine whether that interrogation was custodial, the court's focus is on "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). "Two discrete inquiries are essential to this determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

---

[2] *See United States v. Moore*, 104 F.3d 377, 392 (D.C. Cir. 1997) (Silberman, J., concurring) ("[I]t is the appellant's burden to establish factually that he was in custody as a pre-condition to an argument that the Constitution protects his silence in that situation."); *United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989) (unpublished) (holding that when a defendant seeks to suppress statements on the basis that he was not given Miranda warnings, he has the burden of proving by the preponderance of the evidence that he was subjected to custodial interrogation); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination").

*Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (internal quotation marks omitted).

In this case, it is beyond dispute that some restrictions on Mr. Artis's freedom of movement existed solely because of his status as an inmate. An individual who is incarcerated may be "in custody," but is not, by that fact alone, in custody as contemplated by *Miranda*. *See Maryland v. Shatzer*, __ U.S. __, 130 S. Ct. 1213, 1224 (2010) (analyzing the difference between incarcerative custody and interrogative custody and concluding that "lawful imprisonment imposed on conviction of a crime does not create the coercive pressures identified in *Miranda*."). For this reason, the Second Circuit has rejected a bright line rule that "all prisoners are 'in custody' for purposes of *Miranda*[.]" *Georgison*, 588 F.3d at 157. Instead, it has ruled that custodial interrogation triggering *Miranda* warnings requires restrictions on the inmate's freedom and coercive pressures "over and above ordinary prison confinement[.]" *Id.* (internal quotation marks omitted); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) ("Only questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received in evidence only after *Miranda* warnings have been given."). The Second Circuit's approach in this regard is consistent with that taken by numerous other circuit courts.[3]

---

[3] *See, e.g., United States v. Ellison*, 2010 WL 1493847, at *3 (1st Cir. April 15, 2010) (noting that incarceration does not always result in custodial interrogation but requires examination of the totality of the circumstances); *Tawfeq Saleh v. Fleming*, 512 F.3d 548, 551 (9th Cir. 2008) ("We agree that . . . incarceration does not ipso facto render an interrogation custodial [and *Miranda* warnings] to the person in custody for an unrelated matter will only be triggered by some restriction on his freedom of action in connection with the interrogation itself.") (internal quotation marks and citation omitted); *United States v. Chamberlain*, 163 F.3d 499, 502-03 (8th Cir. 1998) ("The mere fact of incarceration does not ipso facto render an interrogation custodial."); *United States v. Menzer*, 29 F.3d 1223, 1231-32 (7th Cir. 1994) (finding inmate "in custody" for purposes of *Miranda* when there is an additional imposition on the inmate's freedom of movement or a measure of compulsion over and beyond imprisonment); *Garcia v. Singletary*, 13 F.3d 1487, 1491 (11th Cir. 1994) (holding that *Miranda* "custody" occurs only when inmate's freedom is restricted beyond the norm in the setting in which it occurred ); *United*

8

Of course, as part of the totality of circumstances, the fact of incarceration remains relevant to the court's analysis of whether custodial interrogation has taken place. A non-exhaustive list of other factors a court should consider includes the manner in which the defendant was summoned, whether a defendant was told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the police, whether the defendant is searched, frisked, or patted down, the length of the interrogation, the number of individuals questioning the defendant, whether there was any show of force, and whether the defendant's movements were restricted during the questioning beyond the norms of confinement. *See Tankleff v. Senkowski*, 135 F.3d 235, 243-44 (2d Cir. 1998); *Georgison*, 588 F.3d at 155-58; *Cervantes v. Walker*, 589 F.2d 424, 427-28 (9th Cir. 1978).

Examination of the foregoing factors in the context of the January 8, 2010 interview reveals that Mr. Artis's incarceration for an unrelated narcotics conviction was one of the least coercive aspects of the interview. As Justice Souter, sitting by designation on the Court of Appeals for the First Circuit, recently observed:

> While the suspect in a case just like *Miranda* may well feel that the only way to end the pressure on him is to answer the questions, the usual circumstances of someone serving prison time following a conviction characteristically save him from any such apprehension; so long as he is not threatened with harsher confinement than normal until he talks, he knows that the worst that can happen to him will be his return to the prison routine, and he will be back on the street (in most cases) whether he answers questions or refuses.

*United States v. Ellison*, 2010 WL 1493847, at *3 (1st Cir. Apr. 15, 2010) (citing *Shatzer*, 130 S. Ct. at 1224-25).

---

*States v. Conley*, 779 F.2d 970, 973-74 (4th Cir. 1985) ("We . . . hold that a prison inmate is not automatically always in 'custody' within the meaning of *Miranda*."); *United States v. Scalf*, 725 F.2d 1272, 1276 (10th Cir. 1984) (concluding that inmate "was not deprived of his freedom nor was he questioned in a coercive environment," *Miranda* warnings were not required for brief on-the-scene inquiry by correctional officer).

Here, although Mr. Artis was transported to the interview in handcuffs prior to questioning, there is no evidence that the restrictions on his freedom of movement in transit were beyond the norm for the Rikers Island facility. *See Conley*, 779 F.2d at 973-74 ("Although Conley wore handcuffs and, at some points, full restraints, evidence in the record indicates that this was standard procedure for transferring inmates . . . in this maximum security facility."). Moreover, Mr. Artis was not threatened with any greater restrictions on his freedom or further punishment if he failed to answer law enforcement's questions. Instead, given his familiarity with the criminal justice system, it is reasonable to assume that Mr. Artis knew that, at the conclusion of the interview, he would be returning to his cell with no immediate consequences. His repeated statements that he could "do his time with no problem" for a firearm conviction support a conclusion that any ultimate consequences arising from his statements were ones he was prepared to bear. Mr. Artis's status as an inmate therefore did not, alone, transform the January 8, 2010 interview into custodial interrogation.

Other factors, however, weigh in favor of concluding that custodial interrogation occurred. First, there is no evidence regarding what, if anything, Mr. Artis was told when he was summoned to the intelligence center, and thus there is no evidence he was told his presence at the interview was optional. Indeed, Mr. Artis's presence may not have been optional as three law enforcement officers had made special arrangements to interview him, and two officers had travelled some distance to attend the interview. Certainly this is not a case in which Mr. Artis initiated contact with law enforcement or voluntarily acquiesced to an interview. *Cf. United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988) (finding inmate was not subjected to custodial interrogation where inmate initiated interview).

Second, it is undisputed that no one told Mr. Artis that he was free to leave the interview--nor is there any reasonable basis to believe he actually was free to do so. *Cf. Georgison*, 588 F.3d at 147 (finding inmate was not subjected to custodial interrogation

10

because he left the interview room "at a time and in a manner of his choosing, demonstrating that he knew he was at liberty to terminate the interrogation and leave") (internal quotation marks omitted) *with United States v. Chamberlain*, 163 F.3d 499, 503-04 (8th Cir. 1998) (in determining that inmate was subjected to custodial interrogation, court relied on fact that "[a]t no time did . . . any . . . prison official . . . tell [the inmate] that the questioning was voluntary or that he was free to leave the interview at any time"). Accordingly, in this respect, Mr. Artis's freedom of movement was restricted beyond the norm of other inmates who were free to follow the facility's routine free from questioning by law enforcement. Although at the commencement of the interview, Mr. Artis was advised to "sit wherever you like," his options in the small room used for interviewing were extremely limited. The door to the room was shut and possibly locked. There were no windows in the room and no means of summoning someone from outside the room. Mr. Artis had no access to the public even if the public were defined to consist of the inmate and corrections population. Had Mr. Artis decided to leave the interview, it is not clear who was available to implement this request and he could not have returned to his housing unit unescorted. There was thus nothing about the setting or content of the interview that communicated to Mr. Artis, or to a reasonable person in his position, that he was free to leave.

Finally, law enforcement's questioning was accusatory in nature. Mr. Artis was confronted with evidence of his guilt, his story regarding the firearm was met with skepticism, he was repeatedly advised that he could be charged with a crime if he lied, and he was then repeatedly confronted with law enforcement's belief that he had in fact lied. The three law enforcement officers, by necessity, sat in close proximity to Mr. Artis and all three of them questioned him. Towards the end of the interview, at least one of the officers became visibly upset with Mr. Artis's version of the facts. The interview thus approximated "incommunicado interrogation . . . in a police-dominated atmosphere," *Miranda*, 384 U.S. at 445, and the nature, tone, and style of the questioning, as well as

11

the presence of three questioners, subjected Mr. Artis to "a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300; *see also United States v. McFarland*, 424 F. Supp. 2d 427, 444-45 (N.D.N.Y. 2006) (concluding that inmate questioned by three law enforcement officers in prison interview room without *Miranda* warnings "was questioned in a classic custodial setting with inherently coercive pressures").

Based upon the totality of the circumstances, the court concludes that Mr. Artis was subjected to custodial interrogation.

2. *Miranda Waiver.*

Having determined that the January 8, 2010 interview constituted custodial interrogation, the burden shifts to the Government to establish that Mr. Artis validly waived his *Miranda* rights. *United States v. Burger*, 739 F.2d 805, 809 (2d Cir. 1984). The Government must "prove waiver only by a preponderance of the evidence." *Connelly*, 479 U.S. at 168.

The Second Circuit has ruled that the "inquiry into the knowing and voluntariness of a waiver is 'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 211 (2d Cir. 2008) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is unusually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.*; *see also United States v. Caba*, 955 F.2d 182, 185 (2d Cir. 1992) ("it is well settled that a waiver of *Miranda* rights is valid only if it is the product of a knowing and voluntary choice."). "It is also established that the 'question of waiver must be

12

determined on the particular facts and circumstances surrounding [each] case.'" *Caba*, 955 F.2d at 185 (quoting *Butler*, 441 U.S. at 374) (other internal quotation marks omitted).

Application of the foregoing standards to the instant case reveals that Mr. Artis's state of mind was that of a person well-acquainted with the criminal justice system who clearly understood the purpose of law enforcement's questioning and the risk and benefits of waiving his rights. The following facts support this conclusion.

Mr. Artis announced in a "jovial tone" that he was expecting a visit from Vermont law enforcement regarding the firearm and expressed no surprise that he was being questioned. There is no evidence that Mr. Artis suffered from any cognitive difficulties, or that he was suffering from any mental, physical, or emotional distress. To the contrary, Mr. Artis's demeanor throughout the interview was "almost amused." There is no evidence that his waiver was the product of deceit, trickery, threats, coercion, or intimidation. There is also no evidence that law enforcement made any promises to Mr. Artis to secure the waiver.

Although law enforcement questioned Mr. Artis regarding his alleged drug activities as well as regarding the firearm, there is no evidence that this came as a surprise to Mr. Artis and, in any event, law enforcement was not required to advise Mr. Artis of the purpose of the questioning as a precursor to a valid *Miranda* waiver. *See Colorado v. Spring*, 479 U.S. 564, 574 (1987) (defendant's waiver was voluntary even if he was not aware that he would be questioned about a separate crime).

Mr. Artis was read his *Miranda* rights from a simple, one-page, pre-printed form that set forth each right in clear, simple, and concise language. Mr. Artis initialed each right after it was given. He then signed a written waiver, clearly identified as such, that was also set forth in clear, simple, and concise language, indicating that he understood his rights and intended to waive them. The court concludes that any statements that were

13

made by Mr. Artis thereafter were made with full awareness of his rights. Where a defendant's "voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waiver[] [is] valid." *Moran v. Burbine*, 475 U.S. 412, 424 (1986). Here, that standard has been satisfied. Defendant's motion to suppress based on an invalid *Miranda* waiver is thus DENIED.

### B. Voluntariness of Mr. Artis's Statements.

Mr. Artis seeks suppression of all statements he made in the course of the January 8, 2010 interview on the further ground that his statements were not voluntary. "If a defendant's confession was obtained by 'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will,' the statements are inadmissible under the Fifth Amendment." *Tankleff*, 135 F.3d at 242 (quoting *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (internal quotation marks and other citations omitted)). It is the Government's burden to prove, by a preponderance of the evidence, that Mr. Artis's statements were voluntary. *See Burger*, 739 F.2d at 809 (citing *Lego v. Twomey*, 404 U.S. 477, 486 (1972)).

In determining whether statements are voluntary, a court "must examine the totality of the circumstances. Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 213 (quoting *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)). Although an advisement of *Miranda* rights and a subsequent valid waiver of those rights are significant factors to be considered in determining whether a confession is voluntary, they are not dispositive:

> The existence of a knowing and voluntary waiver does not, however, guarantee that all subsequent statements were voluntarily made. Accordingly, we cannot "dispense with the voluntariness inquiry" simply

14

because we determine that a defendant's waiver is valid. Nevertheless, as the Supreme Court has observed, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."

*Id.* at 211-12 (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)).

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) presents similar facts to the instant case which the Second Circuit found weighed in favor of finding the defendant's statements voluntary. There, the defendant had "some familiarity with the criminal justice system by virtue of having been arrested on two previous occasions and questioned once," "[t]he interview with the detectives lasted for just over two hours" and was followed that evening by an interview that lasted a half hour, there was "no suggestion of physical mistreatment by the detectives," the defendant "was not handcuffed during the interrogation," and following it he was "furnished with food, drink and cigarettes." *Id.* at 902-03. Indeed, the instant case presents even more persuasive evidence of voluntariness. Mr. Artis's familiarity with the criminal justice system at the time of the interview was considerably greater than that of the defendant in *Green*. His interview lasted between fifteen and twenty minutes. He was permitted to smoke during the interview and was not handcuffed. At times, the interview was conversational in tone and throughout it Mr. Artis's demeanor was one of "almost amuse[ment]." There is no evidence that he was subjected to threats, trickery, deceit, coercion, promises, or a show of force.

Correspondingly, there is clear evidence that Mr. Artis's will was not in fact overborne. When he was repeatedly confronted with law enforcement's disbelief regarding his account of how he obtained the firearm, he refused to change his story even when told that untruthful statements could be charged as a crime. *See United States v. Wilbon*, 309 Fed. App'x 27, 30 (7th Cir. 2009) (unpublished) (noting that the accused "show[ed] independent thinking and free

15

will" because he "refused to provide a written statement during the interrogation and denied his involvement in other robberies"); *United States v. Vilar*, 141 F.3d 1152, 1998 WL 105771, at *1-2 (2d Cir. Mar. 9, 1998) (unpublished) (finding that accused's will was not overborne because he refused to admit shooting a police officer despite making other incriminating statements). Mr. Artis's repeated statements to law enforcement that he could "do his time with no problem" with regard to a firearm charge further underscore his retention of his free will as they reflect a cost-benefit analysis regarding the advisability of cooperation. Moreover, Mr. Artis's apparent lack of concern regarding the potential long term consequences of his statements was reasonable in the circumstances as he was already serving a sentence, had served a prior sentence, and thus fully understood the realities of incarceration.

Finally, the officers were in street clothes, were not armed, did not touch Mr. Artis in the course of the interview, and remained seated throughout its brief duration. Although towards the end of the interview, Special Agent Mostyn's tone became heated and his body language was confrontational, no questions were asked after this occurred and the interview was terminated.

Against this backdrop, the only evidence that weighs in favor of a finding of involuntariness is the fact that three law enforcement officers questioned Mr. Artis, confronting him with evidence of his guilt and accusing him of lying after telling him that lying to them would be a crime. This evidence supports a conclusion that the law enforcement officers were confrontational, but it does not support a conclusion that they were coercive. *See Parsad*, 337 F.3d at 185 ("all custodial interrogations inherently involve pressure, and officers routinely confront suspects with incriminating evidence.").

Based upon the totality of the evidence, the court concludes that the Government has established by a preponderance of the evidence that Floyd Artis's

16

statements to law enforcement on January 8, 2010 were voluntary. Accordingly, Defendant's request for suppression of that evidence must be DENIED.

## Conclusion

For the reasons stated above, Defendant's motion to suppress is hereby DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 16th day of September, 2010.

Christina Reiss
United States District Court Judge