U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2011 AUG -4 AM 11: 34
CLERK
BY pjl
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:10-cr-15-01
)
FLOYD ARTIS )

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL**
(Doc. 167)

Following his conviction on one count of conspiring to distribute heroin and crack cocaine, Defendant Floyd Artis filed a motion for a new trial under Fed. R. Crim. P. 33. Defendant's motion is based upon two evidentiary rulings: he contends that a statement he provided to law enforcement was erroneously admitted into evidence, and that the exclusion of a photograph burdened his Sixth Amendment right to present a complete defense. The Government opposes the motion. The Government is represented by AUSA Nancy Creswell. Defendant is represented by Alison S. Arms, Esq. and Steven L. Barth, Esq. For the reasons set forth below, Defendant's motion is DENIED.

**I. Background.**

On February 28, 2011, a jury convicted Defendant of conspiring to distribute heroin and more than twenty-eight grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. The charged conspiracy operated from in or about November 2008 until in or about June 2009. At trial, both indicted and unindicted co-conspirators provided testimony, including Mandy Blanchard, James Welcome, Colleen Chapman, and Jessica Kimball. Martika Euber and Randy Forrest also provided testimony as fact witnesses. Each of these witnesses testified that he or she had first-hand knowledge of Defendant's narcotics dealing in Vermont. With the exception of Mr. Forrest, these witnesses either sold drugs at the behest of Defendant or otherwise assisted him in selling drugs, or witnessed all or part of a drug deal. In addition, the jury heard

from Detective Michael Henrique of the New York City Police Department, who interviewed Defendant while he was incarcerated for an unrelated narcotics conviction in New York. Detective Henrique testified that Defendant admitted to dealing narcotics in Vermont and New York.

**A. The Government's Case-In-Chief.**

Ms. Blanchard and Mr. Welcome were each charged in the conspiracy and cooperated with the Government. Ms. Blanchard met Defendant in the fall of 2008 and had become his girlfriend by November 2008. She personally witnessed Defendant cook powder cocaine into crack cocaine, and then weigh and package the crack cocaine for sale. She testified that Defendant's narcotics dealing was a for-profit business, and that Defendant did not personally use heroin or crack cocaine. She also testified that she assisted Defendant in his business in various ways, including by selling heroin and crack cocaine in Vermont at Defendant's direction, renting cars that she and Defendant drove to New York City where he would replenish his supply of drugs, making Western Union wire transfers of drug proceeds to Defendant in Brooklyn, New York, and packaging drugs for sale. She further testified that she purchased a .32 caliber Beretta pistol for Defendant, using money Defendant provided to her, after Defendant was robbed by rival drug dealers in Rutland, Vermont. The Government corroborated Ms. Blanchard's testimony with other witness testimony, and through records of cell phone calls, Western Union wire transfers, and car rentals.

Mr. Welcome is Defendant's nephew. He testified that he joined the conspiracy in April 2009 after Defendant asked him if he wanted to make some money. Mr. Welcome told the jury that Defendant taught him how to conduct the drug dealing business in Rutland, and provided him with both drugs and customers. Mr. Welcome testified that all of the cocaine and heroin that he sold was provided to him by Defendant, and that Defendant placed him in a management position of sorts, instructing him to monitor sales made by Ms. Blanchard and Ms. Chapman, and to hold onto drug proceeds when Defendant was not in Rutland. Mr. Welcome personally witnessed Defendant cook powder cocaine into crack cocaine, and then cut it up and package it for distribution.

Like Ms. Blanchard, Mr. Welcome sent wire transfers of money to Defendant in New York. Mr. Welcome personally saw Defendant with money, including cash that Defendant kept in a safe in his apartment, even though Mr. Welcome never knew Defendant to have a job. As to the Beretta firearm, Mr. Welcome learned from Defendant that Ms. Blanchard had purchased the firearm for Defendant, and Mr. Welcome testified that he saw the firearm, loaded, in Defendant's Brooklyn apartment.

Ms. Chapman also testified to participating in the conspiracy and working at Defendant's direction. She made several trips from Rutland, Vermont to Brooklyn, New York with Defendant and Ms. Blanchard during which Defendant acquired drugs. On one occasion, Ms. Chapman personally carried an ounce of crack cocaine back to Vermont for Defendant, hiding it in her bra. She worked with Ms. Blanchard to sell drugs on behalf of Defendant. Defendant would tell them where to go, whom to meet, and how much money to collect. She also testified that, according to Defendant, the Beretta firearm belonged to him, and that he had asked Ms. Blanchard to buy it for him.

During the spring of 2009, Ms. Blanchard moved into Jessica Kimball's apartment in Rutland. Defendant would occasionally spend the night there as well. Ms. Kimball testified that she sold crack cocaine and heroin at Defendant's request on Mother's Day in May 2009. She told the jury that Defendant called her from Brooklyn and instructed her to deliver drugs that he kept in a shoebox, along with cash, in her apartment. Defendant told her which drugs to take, where to meet the customers, and how much to charge them. Ms. Kimball sold drugs to five customers on that day, and then returned the cash proceeds to Defendant's shoebox.

Martika Euber testified that her "close" friendship with Defendant began five or six years ago, and that the friendship made it difficult for her testify against Defendant. She testified that Defendant was selling crack cocaine and heroin in Rutland, and that he brought drugs into her apartment despite her express request that he not do so. Defendant had instructed Ms. Euber to give the drugs to Mr. Welcome, who would occasionally sell drugs in her driveway. According to Randy Forrest, Mr. Forrest later approached Mr. Welcome at Ms. Euber's request and asked him to stop selling drugs in the driveway.

Ms. Euber also said that Defendant told her that he bought a firearm, and that he had Ms. Blanchard purchase it for him. Mr. Forrest testified that he saw Defendant carrying about $1,000.00 in cash despite not having any employment.

**B. Defendant's Case-In-Chief.**

The defense re-called Ms. Blanchard in its case-in-chief. During her direct examination, Ms. Blanchard testified that she only sold and transported heroin and crack cocaine because she was in love with Defendant, and Defendant told her to do so. She said that she would have done anything for him. She confirmed that she sold drugs after Defendant's arrest in June 2009, but explained that she sold only "what was left in the house." (Doc. 154, Trial Transcript ("Tr.") Day 5 at 35:4-6.)

Ms. Blanchard also testified about an incident that occurred on September 9, 2010, when she was pulled over while driving in Clarkstown, New York. Ms. Blanchard had just left the Bronx, New York after spending the prior two days there. There were four other individuals in the car as well as drugs, including eighty-five grams of crack cocaine, 500 "decks" of heroin, and a straw filled with crushed Morphine pills. Ms. Blanchard was arrested and ultimately pleaded guilty to criminal possession of a controlled substance in the seventh degree.

In response to questioning from the Government, Ms. Blanchard testified that it was not her car, and that she agreed to drive when the vehicle's driver became too tired. The police officer who stopped the vehicle told Ms. Blanchard that he could smell marijuana, and she gave him and other officers permission to search the vehicle. The officers discovered the cocaine and heroin hidden underneath the hood of the car, and the straw filled with Morphine inside of Ms. Blanchard's purse. Ms. Blanchard testified that she had brought the crushed Morphine pills, but the heroin and cocaine did not belong to her, and she did not know that they were hidden in the car. She further testified that another occupant in the car subsequently confessed to owning the cocaine and heroin.

**C. The Contested Photograph of Mandy Blanchard.**

During its direct examination of Ms. Blanchard on the last day of trial, defense counsel requested permission to question Ms. Blanchard about a photograph in which

Ms. Blanchard is posing with her friend Erica Vosburg, and Ms. Vosburg is holding what looks like a handgun. *See* Doc. 167-1. The photograph was downloaded from Ms. Blanchard's Facebook page by the defense team's investigator the day before. The court denied defense counsel's request, primarily because defense counsel failed to raise the issue that morning before the jury was brought in (a time in which the court asked each party if they had anything to raise with the court), the photograph had not been disclosed to the Government, and the court had previously ordered the parties to disclose all evidence in a timely fashion. *See* Doc. 154, Tr. Day 5 at 37:14-39:19.

After Ms. Blanchard had been excused, and after she had been subjected to voir dire on another matter, defense counsel renewed its request to admit the photograph. The defense argued that it was relevant for impeachment because it is inconsistent with Ms. Blanchard's prior testimony in which she stated that "I hate guns really."[1] (Doc. 150, Tr. Day 1 at 94.) The defense also argued that it was probative of the defense claim that Ms. Blanchard purchased the gun for herself, not Defendant, and that Ms. Blanchard's ownership of a firearm—that is, a "tool of the trade"—supported the theory that she and others operated the drug dealing conspiracy without Defendant. The Government objected to introducing the photograph, arguing that it lacked authentication and had not been timely disclosed.

The court again denied defense counsel's request, finding that (1) there was late disclosure of the photograph to the Government; (2) defense counsel failed to voir dire Ms. Blanchard about the photograph even though, earlier that day, it had conducted a voir dire of Ms. Blanchard on another matter; (3) the photograph had "very little probative value" because it did not depict Ms. Blanchard holding a gun, and, in any case, whether Ms. Blanchard does or does not like guns was not an essential issue in the case; and (4) the photograph was unduly prejudicial in that there was late disclosure, and no witness who could provide authentication. *See* Doc. 154, Tr. Day 5 at 71:5-24. The court also

---

[1] The Government elicited this testimony after asking Ms. Blanchard how she felt about guns at the time she claimed to have purchased the Beretta firearm for Defendant. Following her answer, defense counsel objected to the testimony as irrelevant, and the court sustained the objection. (Doc. 150, Tr. Day 1 at 94.)

declined to permit defense counsel to voir dire Ms. Blanchard on the photograph. *Id.* at 74:16-21.

**D. Detective Henrique's Interview of Defendant.**

Detective Henrique interviewed Defendant on January 8, 2010 at the Rikers Island correctional facility in New York. Special Agent James Mostyn, the Bureau of Alcohol, Tobacco and Firearm's ("ATF") Supervisory Special Agent in Vermont, and ATF Agent Thomas McCoy, were part of the interview team. At the time of the interview, Defendant was serving a sentence for an unrelated New York state narcotics conviction.

According to the "Report of Investigation" ("ROI") prepared by Agent McCoy and signed by Agent Mostyn, the interview began at "approximately 11:30 a.m." (Doc. 167-4 at 1.) Agent Mostyn testified at trial that the interview actually began at 11:45 a.m. The ROI also states that Defendant was advised of his Fifth Amendment *Miranda* rights to remain silent and to have counsel present before the agents asked any substantive questions. A form attached to the ROI entitled "Advice of Rights and Waiver" indicates that Defendant waived such rights at 11:45 a.m. Detective Henrique affirmed this sequence of events during his trial testimony, stating that Defendant was advised of and waived his *Miranda* rights before the interview began. *See* Doc. 152, Tr. Day 3 at 225:3-17.

According to the ROI, the agents told Defendant they wanted to question him about a .32 caliber pistol that police recovered following his June 2009 arrest in Brooklyn. Defendant stated that the firearm belonged to a girl in Vermont named Mandy, and that Mandy had purchased the gun because "she was jumped by girls in Vermont." (Doc. 167-4 at 1 ¶¶ 3-4.) He further stated that Mandy left the gun in a rental car she had driven to Brooklyn for Defendant to use. Regarding the sale of narcotics, the ROI noted that Defendant "did concede he was a crack cocaine and heroin dealer in Vermont and New York and he had a felony conviction for cocaine possession in Vermont." *Id.* at 2 ¶ 7.

Prior to trial, the defense moved to suppress all statements that Defendant made during the interview on the ground that his statements were not voluntary. Following a

suppression hearing in which Detective Henrique testified, the court denied the motion, and found that Defendant validly waived his Fifth Amendment rights under *Miranda*, and spoke to the agents voluntarily. The defense subsequently moved *in limine* to exclude Defendant's admission that "he was a crack cocaine and heroin dealer in Vermont and New York." The defense argued that his admission related only to his prior convictions, not the charged conspiracy. Before ruling on the motion, the court permitted counsel to voir dire Detective Henrique regarding Defendant's admission.

In response to defense counsel's voir dire, Detective Henrique testified that "the specific purpose of my interview with [Defendant] was related to the firearm that he was in possession of." (Doc. 152, Tr. Day 3 at 176:12-14.) Detective Henrique added that, "when I was questioning him related to his firearm . . . he proffered to me that he was involved in narcotics activity in Vermont and Brooklyn." *Id.* at 17-20. Defense counsel then asked Detective Henrique if the questions he posed to Defendant about narcotics activity were restricted to Defendant's prior convictions for cocaine possession in Vermont and New York, as opposed to the drug dealing conspiracy charged in this case:

> Q: So when you were talking to him about a narcotics angle, and you were talking [to] him about drug dealing activity, you were talking to him only about those two specific things relative to drug dealing; his previous conviction in 2007 from Rutland, Vermont and what you knew him to be in jail for currently at Rikers Island?
>
> A: What I was speaking to him was related to the . . . firearm that was recovered. Once again, [Defendant] did proffer to us that he was involved in drug dealing in Vermont and Brooklyn. And he was currently in Rikers Island related to narcotics charges in the City of New York.
>
> Q: That's what you knew about in terms of drug dealing activity and [Defendant], those two things, those convictions and him being in jail and the drug charge, that's it?
>
> A: That's correct. I was, you know, my specific intent was to discuss the firearms. Once again, [Defendant] proffered to me that he was, you know, involved in drug dealing in Vermont and in Brooklyn. And he was currently being housed at Rikers Island related to narcotics charges as well as the firearms charge that I was investigating.

> ***
>
> Q: So, when you were talking to [Defendant] in January of 20[10] on Rikers Island and you were talking about information that was elicited from him regarding a narcotics angle the questions that were asked of him were related to his [Vermont], 2007 narcotics conviction and the offense that he was currently incarcerated for on Rikers Island that came out of Brooklyn?
>
> A. I would say no.
>
> Q: Why would you say no?
>
> A: Because [Defendant], when we were discussing . . . narcotics he proffered to us that he was involved in narcotics activity in Vermont and Brooklyn, New York.

*Id.* at 177:18-178:12, 180:22-181:9. The Government then elicited further testimony from Detective Henrique that the agents and Defendant discussed narcotic activities apart from Defendant's two prior convictions:

> Q: You also asked him questions about or at least he offered to you that he had been dealing drugs in Vermont with Mandy Blanchard and named Alicia Richards and Colleen Chapman also?
>
> A: That is correct.
>
> Q: So there were other questions asked of him, correct, other than about his prior convictions?
>
> A: That is correct.

*Id.* at 186:24-187:6. Defense counsel pointed out to Detective Henrique that he had testified during the suppression hearing that he did not ask Defendant any questions "about drug dealing activity that was currently under investigation." Detective Henrique agreed that that was his previous testimony. *Id.* 185:21-25.

Based upon this exchange, the court denied Defendant's motion *in limine* to exclude his admission. The court noted that defense counsel was free to cross-examine Detective Henrique about lack of specificity and details, but explained that "it appears to be an admission related to this particular conspiracy in particular by virtue of the people

named, the activity in question and the locations, none of which have to do with the past convictions except one was in New York and one was in Vermont." *Id.* at 190:11-20. The court added that Defendant admitted to drug *dealing*, while his prior convictions were for narcotics *possession*. *Id.*

## II. Conclusions of Law and Analysis.

Fed. R. Crim. P. 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." On a "Rule 33 motion to vacate, '[t]he ultimate test is whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted)). Even when the trial court errs in its evidentiary rulings, a new trial is not warranted if the court is "satisfied that competent, satisfactory and sufficient evidence in th[e] record supports the jury's finding that this defendant is guilty beyond a reasonable doubt[.]" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account," and there "must be a real concern that an innocent person may have been convicted" before the "interest of justice" requires a new trial. *Id.*

### A. The Exclusion of the Photograph.

The defense argues that excluding the photo of Ms. Vosburg holding a handgun and posing with Ms. Blanchard violated Defendant's Sixth Amendment right to present a complete defense. According to the defense, it should have been admitted for impeachment purposes because it is inconsistent with Ms. Blanchard's express dislike of guns. The defense also argues that it is relevant substantive evidence supporting its claim that Ms. Blanchard bought the .32 caliber Beretta pistol for herself. Further, because firearms are considered to be "tools of the trade" for narcotics dealers, the photograph supports Defendant's theory that Ms. Blanchard and others operated the drug dealing conspiracy completely independent of Defendant. *See United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994). The defense contends that the photograph must be considered in

light of other evidence suggesting that Ms. Blanchard and others were solely responsible for the drug dealing operation, including the facts that Ms. Blanchard was stopped in a car containing heroin and cocaine in 2010 after Defendant's arrest in 2009, and that Ms. Blanchard knew how to cook, package, and sell crack cocaine. The Government argues that the photograph was properly excluded for the reasons explained at trial.

The Sixth Amendment entitles criminal defendants "to a meaningful opportunity to present a complete defense." *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003); *see also Rock v. Arkansas*, 483 U.S. 44, 55 (1987). However, this right is not unlimited, and the "power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled." *Wade*, 333 F.3d at 58. To establish a Sixth Amendment violation, the defendant must first demonstrate that he was deprived of the opportunity to introduce evidence that was "both material and favorable to his defense." *Howard v. Walker*, 406 F.3d 114, 132 (2d Cir. 2005) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). "Materiality" in the Sixth Amendment context is not synonymous with relevance; rather "[m]ateriality generally requires 'a reasonable likelihood' that the [evidence], evaluated in the context of the entire record, 'could have affected the judgment of the trier of fact.'" *United States v. Green*, 2008 WL 4104220, at *1 (2d Cir. Aug. 27, 2008) (quoting *Valenzuela-Bernal*, 458 U.S. at 874 n.10); *see also United States v. Ladoucer*, 573 F.3d 628, 635 (8th Cir. 2009) ("Materiality in this context refers to a concern that the suppressed evidence might have affected the outcome of the trial.") (internal quotation marks omitted). "In light of this standard, materiality cannot be shown if there is no reasonable doubt about guilt." *Green*, 2008 WL 4104220, at *1 (internal quotation marks omitted).

Here, there was no Sixth Amendment violation (even assuming *arguendo* that excluding the photograph was error) because Defendant cannot demonstrate that the photograph was material to his case. First, the photograph is not probative of whether Ms. Blanchard bought the Beretta pistol for herself. It is Ms. Vosburg who is holding the handgun in the photograph, and, in any case, the defense has not suggested that the depicted handgun is the Beretta pistol that Ms. Blanchard purchased and that police later

recovered.[2] The photograph's lack of probative value on this point is particularly evident in light of the other competent evidence showing that it was Defendant, not Ms. Blanchard, who owned the pistol: Mr. Welcome, Ms. Euber, and Ms. Chapman all testified that Defendant admitted to having Ms. Blanchard buy a gun for him, and Mr. Welcome told the jury that he personally saw the loaded pistol at Defendant's Brooklyn apartment. Moreover, the Government established that Defendant acquired the gun because he had been recently robbed by rival drug dealers, and he was ineligible to buy it himself because he was neither twenty-one-years-old nor a Vermont resident.[3]

Second, even if the photograph could have reasonably convinced the jury that Ms. Blanchard kept the Beretta pistol, the gun was only one piece of overwhelming evidence demonstrating that Defendant conspired to distribute heroin and crack cocaine in Vermont. In addition to the testimony from Defendant's co-conspirators and acquaintances—including a relative of Defendant and a "close" friend who admittedly did not want to testify against Defendant—Defendant's drug dealing activity was established through phone records, car rental agreements, Western Union wire transfers, and Defendant's own admission to Detective Henrique that "he was dealing drugs in Vermont as well as in Brooklyn." (Doc. 152, Tr. Day 3 at 185:8-11.) The sufficiency of this evidence is not called into question by the photograph, even if one could infer from it that Ms. Blanchard owned a gun and Defendant did not. Ms. Blanchard's participation in the drug conspiracy was not in dispute—she admitted to selling crack cocaine and heroin, and told the jury that she had been indicted as a co-conspirator in this case. Her

---

[2] The Beretta pistol itself was introduced as evidence through New York City Police officer Daniel Nicoletti. Officer Nicoletti testified that he participated in the arrest of Defendant in Brooklyn on June 20, 2009, and that later that day he retrieved the "black .32 caliber Beretta Tomcat" from Fatima Anderson. (Doc. 152, Tr. Day 3 at 248:1.) Fatima Anderson had been identified by other witnesses, including Ms. Blanchard, as Defendant's "baby mother" who would carry drugs for Defendant from Brooklyn to Albany, New York. (Doc. 150, Tr. Day 1 at 20:23, 45:16-46:2.)

[3] During its summation, defense counsel suggested that Ms. Blanchard bought the gun for self-protection following a physical altercation with Ms. Euber. *See* Doc. 149, Tr. Day 5 at 148:14-149:1.

undisputed involvement does not detract from the overwhelming evidence of Defendant's extensive drug dealing activity.

Finally, the photograph had little, if any, impeachment value for three reasons. First, there is nothing inherently inconsistent between the photograph and Ms. Blanchard's trial testimony. Ms. Blanchard testified that she "hate[s] guns really," but she also testified that she walked into a gun store and purchased one for Defendant. Such testimony is not inconsistent with a photograph of someone *else* holding what appears to be a handgun and posing with Ms. Blanchard. Second, whether Ms. Blanchard does or does not hate guns is simply not relevant to whether the Beretta pistol was Defendant's gun, and defense counsel acknowledged as much by objecting to that testimony on relevance grounds. Third, the court *sustained* defense counsel's relevance objection, thereby indicating to the jury the irrelevance of Ms. Blanchard's personal feelings about firearms.

For these reasons, and in light of all the competent evidence supporting the jury's guilty verdict, exclusion of the photograph does not "undermine[] confidence in the outcome of the trial," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)), and therefore the photograph is immaterial, and there was no Sixth Amendment violation. *See United States v. Garcia*, 936 F.2d 648, 655 (2d Cir. 1991) (finding that "Government's failure to disclose the photographic identification evidence" was harmless because it "in no way affected the outcome of the trial").[4]

**B. Defendant's Admission.**

Defendant argues that his admission to Detective Henrique that "he was a crack cocaine and heroin dealer in Vermont and New York" (Doc. 167-4 ¶ 7) should not have been admitted. Defendant's argument is based upon two factual claims: (1) Defendant

[4] Given this conclusion, a new trial would not be warranted under Rule 33 even if exclusion of the photograph was improper under the Federal Rules of Evidence. As set forth above, the question on a Rule 33 motion is not whether there was legal error of any sort, but whether there is "competent, satisfactory and sufficient evidence in th[e] record" to "support[] the jury's finding that this defendant is guilty beyond a reasonable doubt[.]" *Sanchez*, 969 F.2d at 1414.

made the admission prior to waiving his rights, and therefore it was inadmissible under *Miranda v. Arizona*, 384 U.S. 436 (1966);[5] and (2) Defendant's admission referred only to his two prior, unrelated convictions, not to the charged conspiracy. The Government argues that Defendant is mistaken as a matter of fact on both points.

First, there is no basis to reasonably conclude that Defendant provided any statements prior to waiving his Fifth Amendment rights. The Advice of Rights and Waiver form indicates that it was signed by Defendant and Detective Henrique at 11:45 a.m. Agent Mostyn testified that the interview began at 11:45 a.m., and Detective Henrique testified that he advised Defendant of his rights before any substantive questions were asked. Further, according to Detective Henrique, the ROI accurately states that Defendant waived his rights before speaking to the agents. *See* Doc. 167-4 ¶ 2. All of this evidence supports the conclusion that Defendant waived his *Miranda* rights before admitting to narcotics dealing. The only evidence arguably to the contrary is the ROI's indication that the interview of Defendant began at "*approximately* 11:30 a.m." *Id.* ¶ 1 (emphasis supplied). That statement is not inconsistent with the interview commencing at *exactly* 11:45 a.m., and provides no basis to discount the testimonial evidence that Defendant waived his rights at the outset of the interview. Accordingly, the admission of Defendant's statement did not violate *Miranda*.

Second, Detective Henrique's testimony during voir dire clearly established that Defendant's admission related to the charged conspiracy. The defense seizes on Detective Henrique's testimony that he intended to question Defendant primarily about the recovered Beretta firearm, and that he did not specifically ask about an ongoing narcotics investigation, to conclude that Defendant must have been speaking only about "past activities for which he had done his time or was presently serving time." (Doc. 167 at 19.) But it is what Defendant said with regard to narcotics dealing, not the questions or how the questions were framed, that is dispositive. Here, Defendant specifically referred

[5] In *Miranda*, the Supreme Court set forth a bright-line prophylactic rule designed to protect the Fifth Amendment rights of criminal suspects. Under the rule, a statement made by a suspect who is in custody is inadmissible unless the suspect was advised of his rights and validly waived those rights. *See generally Maryland v. Shatzer*, 130 S. Ct. 1213, 1219-20 (2010).

to dealing drugs in Vermont and New York with Ms. Blanchard, Ms. Chapman, and Ms. Richards. This could only have referred to the charged conspiracy because neither Ms. Blanchard nor Ms. Chapman had even met Defendant prior to that time, and because Defendant's prior convictions were only for *possession*, not dealing. As the court explained during trial, any lack of specificity in Defendant's admission was properly the subject of cross-examination, but there was no basis to exclude the statement entirely.

Because Defendant's admission was made after a valid waiver of his Fifth Amendment rights,[6] and because it pertained to the time period of the charged conspiracy, there was no error in admitting it.

**C. Cumulative Error.**

Finally, Defendant argues that even if no single error warrants a new trial on its own, the cumulative effect of the evidentiary errors in this case is sufficient to vacate Defendant's conviction and order a new trial. *See* Doc. 167 at 19-20 (citing *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008)). This argument fails because Defendant has not identified multiple errors. Defendant's admission was properly admitted, and the exclusion of Ms. Blanchard's Facebook photograph did not compromise Defendant's Sixth Amendment right to present a complete defense.

The evidence of Defendant's guilt in this case was overwhelming, and the court has no "real concern that an innocent person may have been convicted." *Sanchez*, 962 F.2d at 1414. Accordingly, a new trial is not warranted.

**III. Conclusion.**

For the reasons set forth above, Defendant's motion for a new trial (Doc. 167) is DENIED.

SO ORDERED.

---

[6] In its Opinion and Order denying Defendant's motion to suppress, the court explained at length how Defendant's waiver of rights was valid, and here the defense challenges only the timing of Defendant's waiver, not its validity. *See* Doc. 25 at 6-14.

Dated at Rutland, in the District of Vermont, this 4th day of August, 2011.

Christina Reiss, Chief Judge
United States District Court